J-A02018-21 & J-A02019-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF C.M.-S. D. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 852 WDA 2020 |

Appeal from the Decree Entered July 2, 2020
In the Court of Common Pleas of Warren County Orphans' Court at
No(s):  AN No. 10 of 2019

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.M.-S.D. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.M.-S.D. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 853 WDA 2020 |

Appeal from the Decree Entered July 2, 2020
In the Court of Common Pleas of Warren County Orphans' Court at
No(s):  A.N. 10 of 2019

BEFORE:  BOWES, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY NICHOLS, J.:                **FILED: MARCH 17, 2021**

Appellants B.B. (Mother) and her son, C.M.-S.D., born in October 2008

(Child), through his legal interest counsel, separately appeal from the decree

terminating Mother's parental rights to Child, pursuant to Section 2511 of the

Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1]  We affirm.

The trial court set forth the relevant factual and procedural history as

follows:

> In October 2015, Warren County Children and Youth Services
> (CYS) began providing general protective services to Mother,
> Father, and [Child].  Mother and Father had already separated
> prior to involvement by CYS and until this time, [Child] resided
> with Father and paternal grandfather . . . .  During this time,
> Mother was minimally involved with [Child].  In October 2015, at
> the age of seven (7) years old, [Child] began his lengthy course
> of psychiatric treatment.
>
> [Child] was in kindergarten during the 2014-2015 school year.
> During this time, [Child] behaved disruptively at school, garnering
> seventy-two (72) restraints by school personnel.  As a result,
> [Child] was provided with Family Based Mental Health services in
> the home and school settings as well as emotional support at
> school.  This was the last time [Child] was in a public-school
> setting.  On September 11, 2015, Father admitted [Child] to
> Millcreek Hospital for a psychiatric evaluation.  On September 15,
> 2015, Father attempted to remove [Child] against medical advice.
> From October 23, 2015 until August 9, 2018, when [Child] was
> adjudicated dependent, he has had numerous psychiatric
> admissions, including: Beacon Light's Short-Term Adolescent
> Recovery (STAR) program from October 14, 2015 through
> December 2, 2015; Beacon Light['s Residential Treatment Facility
> (RTF)] Placement from December 2, 2015 through July 6, 2016;
> Southwood ADD/ID Unit from July 6, 2016 through April 27, 2017;
> Southwood Psychiatric Facility from April 27, 2017 through August
> 18, 2017; Barber National Institute where he was hospitalized for

---

[1] We address the appeals in a single memorandum.  In the same decree, the trial court also terminated the parental rights of S.C.C. (Father), the biological father of Child.  Father was incarcerated and attended the evidentiary hearings by video conference.  Father did not file a notice of appeal, nor did he participate in this appeal by filing a brief.

fifteen (15) days; Sara Reed RTF; and ultimately, George Junior Republic where he has resided since August 2018.

[Child] was previously diagnosed with Autism Spectrum Disorder with Intellectual Disability with Social Impairment but without language impairment and Intellectual Development Disorder. Most recently, [Child] was diagnosed with Oppositional Defiant Disorder, Rule Out Conduct Disorder—childhood onset type, Intermittent Explosive Disorder, Parent Child Relational Problems, ADHD-combined type, Victim of Physical Abuse, and Rule Out Reactive Attachment Disorder. Despite over eleven (11) months at George Junior Republic since his adjudication as dependent, [Child] has neither met discharge goals nor maintained progress for an uninterrupted period of thirty (30) days, which is the prerequisite for achieving in the program's "level" behavioral system. Further, [Child] has frequently required crisis unit intervention.

On August 18, 2017, [Child] was discharged from Southwood Inpatient Psychiatric Hospital to the care of Mother, after having been a resident of Southwood since July 6, 2016. From August 18, 2017 through October 8, 2017, Mother exercised physical custody of [Child] during the week with Father exercising physical custody during the weekends. On October 8, 2017, Father was arrested for [driving under the influence (DUI)] after police discovered Father and [Child] stopped following a one-vehicle crash. Subsequently, Father was charged with DUI and Endangering the Welfare of a Child. He pleaded guilty to DUI and Resisting Arrest . . . .

From October 8, 2017 (the date of Father's arrest) through April 10, 2018, Mother did not allow any contact between Father and [Child]. On April 11, 2018, following a telephone call between [Child] and Father, [Child's] negative behaviors escalated to the point where Mother returned [Child] to Father on April 12, 2018. [Child] resided with Father from this point until July 8, 2018. On July 8, 2018, [Child] called Mother reporting that he was frightened by Father, who was intoxicated and brandishing a loaded firearm during an altercation in the home. Mother instructed [Child] to call and report the incident to police because she declined to get involved. [Child], who was nine (9) at the time, complied and called the police resulting in Father's arrest and ultimate conviction following plea negotiations where he pleaded guilty to Recklessly Endangering Another Person

(specifically, paternal grandfather) and Person Not to Possess/Use Firearm—Incompetent, for which he is currently serving a term of imprisonment in [a State Correctional Institution (SCI)]-Houtzdale.

Unfortunately, this was not the only traumatic event that [Child] had to endure while in Father's physical custody. [Child] reported that Father had killed a family pet, an allegation supported by Father's statement to Connie Snyder, the family's CYS caseworker, "Why should I pay a vet money when there was a perfectly good baseball bat sitting nearby?" On March 4, 2016 Father was cited by CYS for Causing Serious Physical Neglect of a Child—Failure to Provide Medical Treatment/Care to [Child]. During a weekend visit with Father, [Child] reportedly shot himself in the leg with a pellet gun. Father neither sought medical attention for [Child] nor reported the incident to authorities. The injury only came to light when [Child] complained of pain to Beacon Light RTF personnel upon return to their facility following the visit to Father's home. [Child's] wounds to the knee area of his right leg included, "multiple metallic fragments" within the "posterior medial soft tissues." [Child] has been adamant since his adjudication hearing that he does not want any contact with Father and the Court ordered no visitation until a treating therapist deems it appropriate.

Mother has demonstrated significant passivity with respect to parenting [Child,] repeatedly stating that she will care for him when he has "been fixed" by his mental health treatment providers. Throughout [Child's] lengthy course of psychiatric treatment, Mother's participation in [Child's] treatment plan has been limited to sporadic phone calls or video participation in family therapy sessions and visits with [Child]. Since [Child's] admission to George Junior Republic on August 9, 2018, Mother has only visited sporadically, with her last family therapy session taking place on July 15, 2019. Equally concerning is Mother's lack of attentiveness to [Child] on a personal level. Both [Child] and his health care providers report that telephone contact is frequently attempted but Mother more frequently than not fails to answer or return calls.

From February 2016 through March 2019, Mother resided in Warren, Pennsylvania with her boyfriend . . . . When the relationship ended, Mother obtained her own apartment in Youngsville. During this time, Mother shared custody of her two

(2) younger children with their father, [S.B.]. Mother worked as a clerk/supervisor at Sheetz and frequently left the children with maternal grandparents . . . . In May 2019, Mother's contact with her two (2) younger children ([Child's] half-siblings) was limited to "supervised visitation" based upon a finding of "drinking in excess and engaging in verbal and physical confrontations in front of the children." Maternal grandparents currently have custody of Mother's younger children.

At the time of [Child's] dependency, Mother declined being named as a placement resource for him because her then boyfriend was unwilling to have [Child] reside with them. From August 2019 through November 2019, Mother lived with [G.M.] and worked as a cashier at Dairy Queen. Mother then moved to Tidioute to live with [M.J.] where she worked parttime at a restaurant/bar. Mother was told to take parenting classes but never followed through with her Family [Service] Plan. In April 2015, Mother was charged at Warren County Criminal Docket [ ] with DUI. Mother's alcohol consumption continued to be an issue. At the time of the evidentiary hearing Mother was continuing to address her sobriety issues but was still unable to live independently.

[Child] is currently eleven (11) years old [and] for several years he has suffered violence and trauma in Father's home and willful neglect by Mother. Prior to his adjudication of dependency, [Child] has received mental health treatment in numerous institutions for close to four (4) years and since his adjudication as a dependent child, two (2) foster care placement efforts were disrupted before he was eventually placed at George Junior Republic, where he still resides today.

Trial Ct. Op., 8/10/20, at 1-6.

On July 17, 2019, CYS filed petitions to terminate Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (b). Alan M. Conn, Esq., represented the best interests of Child as guardian *ad litem* (GAL). The trial court appointed Cynthia K.D. Klenowski, Esq., to represent the legal interests of Child on October 25, 2019. Evidentiary hearings were held on February 14, 2020, June 29, 2020, and on June 30, 2020. CYS presented the

- 5 -

testimony of Mandy Anderson, the clinical director at George Junior Republic; Peter von Korff, M.D., a court-ordered psychologist; Connie Snyder, a caseworker for CYS; and Kyle Corbin, a caseworker for CYS. Mother did not testify or present any witnesses. Child did not testify.

In the decree dated June 30, 2020, and entered on July 2, 2020, the trial court found that, with regard to Mother, CYS met its burden of proof under Section 2511(a)(1), (2), (5) and (b) of the Adoption Act, and subsequently terminated Mother's parental rights to Child. On July 29, 2020, Mother filed a notice of appeal, along with a concise statement pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On the following day, July 30, 2020, Child's legal interest counsel filed a notice of appeal and concise statement on behalf of Child.

Child presents the following issues for our review:

1. Did the [trial] court err and abuse its discretion by determining that the burden of proof was met by clear and convincing evidence to show that involuntary termination of parental rights was warranted under 23 Pa.C.S.[ ] § 2511(a)(1), (2), and (5)?

2. Did the [trial] court err and abuse its discretion by failing to adequately consider the developmental, physical and emotional needs and welfare of [C]hild?

Child's Brief at 4 (some formatting altered).

Mother presents the following issues for our review:

1. Did the [t]rial [c]ourt err and abuse its discretion by failing to give primary consideration to the developmental, physical and emotional needs and welfare of [C]hild pursuant to 23 Pa.C.S.[ ] § 2511(b) in that [C]hild had expressed disagreement to any

- 6 -

adoption proceeding which would require his consent, [Child] had indicated that [M]other and siblings were extremely important to him, and that there were no potential permanent resources for [C]hild by way of a fit and willing relative or foster family at the time of the termination and thus, [C]hild had been orphaned by the [trial c]ourt's decision?

2. Whether the [trial c]ourt had insufficient evidentiary support to find that termination of Mother's parental rights was warranted under 23 Pa.C.S.[ ] § 2511(b) because [CYS] did not put forth clear and convincing evidence that termination was in the best interest of [C]hild because the evidence showed that [C]hild's permanency was speculative in nature because no prospective placement had been located, [C]hild was opposed to adoption and that [C]hild felt strongly toward keeping a relationship with [M]other and siblings?

Mother's Brief at 7.

In matters involving involuntary termination of parental rights, our standard of review is well-settled.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*,

214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by an assessment of the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*B.J.Z.*, 207 A.3d at 921 (citation omitted). We have defined clear and convincing evidence as that which is "so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Z.P.*, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted). A child has a right to a stable, safe, and healthy environment in which to grow, and the "child's life simply cannot be put on hold in the hope that the parent will summon the

ability to handle the responsibilities of parenting." *In re I.J.*, 972 A.2d 5, 9 (Pa. Super. 2009).

In the present case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5) and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the trial court's decision to terminate under Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \* \* \*

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> \* \* \*

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his [, or her,] physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal[,] as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008).

Moreover, this Court has previously stated:

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

- 10 -

*Id.* (citation omitted). Where a parent does not "exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited." *In re A.S.*, 11 A.3d 473, 481 (Pa. Super. 2010).

As to Section 2511(a)(2),[2] Child, through his legal interest counsel, contends that insufficient evidence was presented to support a determination that there was a continued incapacity of Mother to provide essential care for Child. Conversely, Child avers that Mother was compliant with the Family Service Plan "to the best of [her] ability" and that Mother "has a foundation for developing the skills needed to be an appropriate parenting resource." Child's Brief at 14-15.

CYS argues that the trial court did not err and that Mother's "passivity in parenting [Child] fully justifies and supports the termination of her parental rights." CYS's Brief at 8. With respect to Mother's inability to complete her goals, CYS explains:

> [Child] was removed from his father's home when placed, which was precipitated by his father's criminal conduct in the home. Three months prior, [Mother] had dropped . . . Child off at his father's home and relinquished responsibility for him, repeating a prior abandonment of . . . Child to his father in 2014. Even were [Child] to progress in treatment successfully enough to be discharged, [Mother] cannot provide him a home.
>
> Since [Child's] placement, [Mother] has accomplished nothing beyond wishful thinking [to] position herself to parent [Child]

---

[2] Mother has not challenged the trial court's determination that clear and convincing evidence exists to satisfy 23 Pa.C.S. § 2511(a)(1), (2) and (5), but rather focuses her challenge on Section 2511(b).

- 11 -

following his treatment. At the time of the hearing, [Mother] had not maintained stable housing, employment, completed any parenting classes, maintained sobriety, and was facing an impending sentence for her second DUI conviction. She had lost custody of her younger two children as a consequence of exposing them to domestic violence while she was intoxicated. She had failed to consistently address . . . Child's needs; missing months of visits and phone calls and minimally participating in his therapy. His preoccupation with her intermittent involvement derails him and sabotages his treatment in that he falls into a reenactment pattern to force from adults the only response that he knows how to handle: rejection.

*Id*. at 8-9.

The trial court found that the record unequivocally established Mother's unwillingness and inability to acknowledge and make the necessary progress in addressing her parental deficiencies that led to Child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being. The trial court explained:

Mother was offered numerous resources to fulfill her parental duties which she either ignored or discontinued. "Mother was encouraged to take parenting classes starting in December 2015 but she never took any classes. . . She was supposed to be attending AA meetings and staying sober, but she didn't do either." Mother was given many opportunities to visit [C]hild and was encouraged to take an active role in his treatment plan, but she never fully committed. Dr. von Korff noticed this same passivity during his interview and observation with Mother and [C]hild. "I guess the overriding comment about that initial interview was really any absence of self-directed commentary and thought. She really did not put into that initial interview any thinking about her own place in [C]hild's difficulties." Mother's passive participation in raising and caring for [C]hild and her disinterest in actively participating in [C]hild's treatment, as well as her own, clearly shows that she has failed to perform her parental duties.

\* \* \*

. . . Mandy Anderson, the Clinical Director at George Junior Republic, discussed [C]hild's current status at his treatment facility. "There have been no family therapy sessions with Mother and [C]hild since July 15, 2019." After several cancellations and rescheduled appointments, Mandy Anderson requested that Mother let the facility know what times and dates would work with her schedule. "I then asked her at that point in time to reach out to me, and let me know her availability. And, I had not heard from her after that." Mother was not only given numerous opportunities to participate in [C]hild's treatment, but she was also given the luxury of scheduling meetings and appointments to do so when it was convenient for her. However, Mother made no effort to participate and never got in touch with [C]hild's facility. While Mother did participate in some personal treatment, it was short-lived and she quickly reverted back to her prior addiction issues. "Mother got her drug and alcohol treatment through Family Services and completed the program after her first DUI." However, Mother not only got a subsequent DUI, but she also lost custody of her other two (2) children due to her drinking and fighting in their presence. Considering the short-lived and minimal attempts at progress Mother made towards her own sobriety, it is clear that Mother's incapacity as a parent cannot be remedied.

Trial Ct. Op., 8/10/20, at 11-13 (record citation omitted).

The record supports the trial court's decision to terminate Mother's parental rights pursuant to Section 2511(a)(2). Ms. Anderson testified that Mother did not attend parenting classes, did not continue to attend Alcoholics Anonymous meetings and failed to maintain sobriety, and did not comply with mental health services. N.T., 2/14/20, at 184-185; N.T., 6/29/20, at 239. Ms. Anderson explained that family therapy was discontinued due to Mother's lack of participation. N.T., 2/14/20, at 46-47. Mother also had a goal of maintaining contact with Child while he has been placed at George Junior Republic; however, out of the fifteen months of his placement, Mother did not

visit Child for four months and Ms. Anderson described her phone contact being as "[i]nconsistent and sporadic." *Id.* at 185-186.

Based on the forgoing, the record demonstrates clear and convincing evidence of Mother's repeated and continuing incapacity to meet her goals that led to Child being without parental care and subsistence, including a safe, secure, and permanent environment in which to grow. Further, the evidence supports the finding that it is unlikely Mother will remedy the situation given CYS's extensive history of providing services and aid to Mother with Mother only achieving inconsistent and sporadic progress in her goals. Accordingly, we discern no abuse of discretion or error of law in the trial court's determination to terminate Mother's parental rights to Child pursuant to Section 2511(a)(2). *See T.S.M.*, 71 A.3d at 267. Child's first issue, therefore, is without merit.

We now proceed to the second part of the analysis under Section 2511(b). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

***T.S.M.***, 71 A.3d at 267.

With respect to the bond analysis pursuant to Section 2511(b), the Court explained, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." ***Id.*** "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***Id.*** at 268 (citation omitted). Moreover, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Mother and Child both challenge the trial court's determination that there was clear and convincing evidence that involuntary termination of Mother's parental rights would best serve the developmental, physical, and emotional needs of Child.

Mother contends that there was insufficient evidence to support a determination that termination of her parental rights was in the best interest of Child pursuant to Section 2511(b). Mother asserts that she relinquished care of Child to Father in the past because "[t]here was indication that [C]hild was difficult to deal with behaviorally[.]" Mother's Brief at 11. Mother also avers that because she shares a bond with Child and an adoptive resource has

not been identified, termination of her parental rights will result in Child becoming an orphan and cause detrimental emotional effects for Child. *Id*. Mother further argues that, given Child's age, his preference not to be adopted should be given more consideration. *Id.* at 11-12.

Child contends that the trial court erred when it determined that CYS met its burden of proof for termination of Mother's parental rights and failed to adequately consider Child's developmental, physical, and emotional needs and welfare. More specifically, Child avers that the trial court failed to take into account the possible consequence of creating an orphan if Child refused to sign a consent to adoption. Child's Brief at 18.

In determining that the evidence established that termination of Mother's parental rights would best serve the developmental, physical, and emotional needs and welfare of Child, the trial court explained:

> First, the [c]ourt] acknowledges that there is a bond between Mother and [C]hild. While Dr. von Korff freely admits that there is an emotional connection between Mother and [C]hild, he does not believe it is a beneficial one. "What we seem to pick up, although more from [Mother] than from [Child] is that his preoccupation with her has the idea in it of protecting her from trauma." As discussed earlier, Mother and [C]hild have what Dr. von Korff refers to as an "upside-down" relationship where [C]hild takes on the parental role over Mother. Mother has looked to [C]hild for protection or safety when she does not offer the same to him. [C]hild was present when Father brandished a loaded firearm and threatened paternal grandfather. [C]hild's first phone call was to . . . Mother looking for help and reassurance. Mother not only offered no assistance to [C]hild in this dangerous situation, but when relating this incident to Dr. von Korff, she recalled stating, "First, I am not coming to save you this time. Second, you will have to do this alone. And third, speak for yourself, [C]hild." This clearly demonstrates not only the lack of

any meaningful relationship between Mother and [C]hild, but it shows how maintaining a relationship with Mother would further impede [C]hild's recovery and ability to move forward in the future.

Next, [C]hild claims that termination of Mother's parental rights will have a negative impact upon him. On the contrary, all of the evidence presented at the hearing shows that the continuation of a relationship between Mother and [C]hild would be detrimental to him presently and to his future recovery. The inconsistency of their relationship since [CYS] first became involved in October 2015 has remained to this day. Since that time, Mother has relinquished custody of [C]hild twice to his [f]ather, where [C]hild was either abused, injured, or a witness to criminal activity. Mother has also lived with several male companions, some of whom did not want [C]hild to live with them, and Mother's response was to send [C]hild to live elsewhere. [C]hild has never been the priority in Mother's life. Connie Snyder testified about a particular time where Mother missed a visit with [C]hild in his treatment facility. Mother had planned to come visit and [C]hild was expecting her when she called to tell the facility that she wasn't able to come. When the facility inquired as to why she was unable to visit, she explained she had gotten a dog while on vacation. Connie Snyder had to explain this situation to [C]hild. "I did talk to him about the dog. He was disappointed because the places where his [M]other lived, she didn't have space for him to come with her if he was to be discharged and he was disappointed that she had room for a dog but not for him." These types of events and disappointments have occurred consistently throughout the five (5) years of involvement between Mother and [C]hild with [CYS]. Dr. von Korff doesn't believe these behaviors come from a place of ill-will, however regardless of the motivation of these behaviors, their effects have negatively impacted [C]hild for years. "I don't think she does anything intentionally to. . . damage the relationship but she has lack of insight into some really highly rejecting behaviors." It is evident to the [c]ourt] that until Mother's rights are terminated, [C]hild has no possibility of ever succeeding in his treatment and being able to move forward towards a better and stable life.

Trial Ct. Op., 8/10/20, at 14-16.

The record supports the trial court's decision to terminate Mother's parental rights pursuant to Section 2511(b). With respect to the "upside down" relationship described by Dr. von Korff, he conceded that while it is a form of loving behavior, "it's not a kind of loving behavior that's going to generate a secure status for the youngster in terms of his place in the world and his sense of attachment." N.T., 2/14/10, at 88. Dr. von Korff noted that Child "has experienced [M]other as very inconsistently available as a mother in person. Sometimes she is a mother in person, and sometimes she is like a peer." *Id.* at 93. Dr. von Korff described Mother and Child's bond as being one that is not secure and explained that "at best, you could say it's a complex and troubled attachment." *Id.* at 98. Specifically, Dr. von Korff described that Child "is avoidant and minimally engaged with [Mother]. So, I see that as evidence of an insecure attachment arrangement between them." *Id.* at 110. Ms. Anderson also emphasized that Child needs "consistency" in order for him to continue to work on building trust and attachment. N.T., 2/14/20, at 33.

Based on the foregoing, there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding Child's needs and welfare. We discern no error or abuse of discretion in its determinations under Section 2511(b).

As to Mother and Child's further arguments regarding Child's preferences and the absence of a pre-adoptive home, our Supreme Court has

stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. In addition, the Pennsylvania Dependency Benchbook provides that "[w]hile having an identified adoptive resource is not a prerequisite for [termination of parental rights], ideally there should be a strong likelihood of eventual adoption." Administrative Office of Pennsylvania Courts Office of Children and Families in the Courts, Pennsylvania Dependency Benchbook § 12.1 at 126 (2010).

Here, at the time of the final termination hearing in June of 2020, Child was eleven years of age and had consistently maintained a preference not to have Mother's rights terminated. N.T., 6/29/20, at 300-01. At that time, Mother was living in a half-way house for drug and alcohol treatment. *Id.* at 285. Moreover, Mr. Corbin testified that CYS had identified two families that could be potential adoptive resources. *Id.* at 284 and 299. The trial court credited the testimony of Dr. von Korff about the slim likelihood that the attachment between Child and Mother can be made secure or beneficial for Child and noted that "[C]hild and [M]other are in a real difficulty at this point in time." *Id.* at 105. The trial court credited Dr. von Korff's testimony that it has been difficult for Mother to "think hard about the recommendations that are being made [by] mental health professionals, and really try to see herself

as someone who needs to learn. Someone who needs to rely on expertise."

*Id.* Dr. von Korff cautioned:

> Well, I, I fear that he is headed for, if he doesn't achieve some, some measure of security now, he is headed for being an angry alienated adult. Very possibly one who has the kinds of anger management problems that he has witnesses in his father and with the other male figures that have crossed his path.

*Id.* at 105-106.

Based on the foregoing, we conclude the trial court's findings are supported by the competent evidence in the record, and the trial court did not err or abuse its discretion in granting CYS's petition to terminate Mother's parental rights as to Child. Accordingly, we affirm the trial court's decree.[3]

Decree affirmed.

---

[3] At the hearing, Child's legal interest counsel asserted that Child would not consent to an adoption, questioned CYS's witnesses, including Connie Snyder, on cross-examination about this point, and raised it in her closing argument. *See* N.T., 6/29/20, at 263-65; N.T., 6/30/20, at 336-43. Both Mother and Child have included a discussion of this consideration in their briefs, as has CYS. *See* Mother's Brief at 7, 11-12; Child's Brief at 10, 16-18; CYS's Briefs at 25-27. The trial court rejected the argument that Child does not wish to be adopted as not being the overriding concern because of Child's best interests.

We acknowledge that this Court has vacated and remanded a termination decrees where the child's appointed counsel failed to raise arguments that a child would not be amenable to signing a consent to adoption. *See Interest of D.G.*, 241 A.3d 1230, 1232 (2020); *Interest of D.N.G.*, 230 A.3d 361, 367-68 (Pa. Super. 2020)). Here, however, Child's counsel actively advocated at the hearing concerning Child's position on consenting to adoption and the present case presents different facts from which the trial court could properly conclude that Child's remaining in Mother's care and custody is not in Child's best interest. Therefore, we do not find *D.G. or D.N.G.* to be applicable.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  3/17/2021